IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LOU DORRIS JOHNSON,

                    Plaintiff,                                 OPINION & ORDER

        v.
                                                               13-cv-91-wmc

WISCONSIN DEPARTMENT
OF HEALTH SERVICES and JAMES HENKES,

                    Defendants.

---

In this civil action, defendants Wisconsin Department of Health Services and James Henkes are alleged to have wrongfully terminated plaintiff Lou Dorris Johnson due to her race in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Equal Protection Clause of the Fourteenth Amendment. Specifically, Johnson alleges that defendants terminated her under circumstances where similarly situated white employees would not have been terminated. As evidence, Johnson points to a white employee who purportedly engaged in similar conduct but received only a suspension. Johnson seeks compensatory damages for lost wages, benefits and earning potential, as well as damages for mental and emotional distress.

Before the court is defendants' motion for summary judgment. (Dkt. #11.) Defendants argue that Johnson has not established a genuine dispute of material fact as to whether her termination was racially motivated. Because the court finds no reasonable jury could conclude Johnson and her would-be comparator are similarly situated, the court will grant defendants' motion in its entirety.

UNDISPUTED FACTS[1]

## I. Background

Southern Wisconsin Center ("SWC") is operated by the Wisconsin Department of Health Services ("DHS") and provides care for individuals with developmental and intellectual disabilities.  In 1998, plaintiff Lou Dorris Johnson, who is African-American, began working at SWC as a certified nursing assistant ("CNA").  Since 2007, defendant James Henkes has served as the director of SWC.[2]  Henkes has the authority to make final decisions regarding employee discipline, up to and including termination.

DHS has a number of work rules that employees must follow at all times.  These work rules apply to SWC employees, who receive and sign a copy of the rules before starting their employment.   Among other things, the work rules prohibit resident abuse, insubordination and illegal conduct.   Specifically, employees may not abuse, strike or deliberately cause mental anguish or injury to patients, nor may they use loud, profane or abusive language.  (Henkes Decl. Ex. 1 (dkt. #15-1) 1.)  Beyond being required to review the rules, SWC employees are trained to avoid physical confrontations with residents and to remove themselves from situations where residents become aggressive.  An employee found guilty of abuse almost always receives a significant suspension or is terminated.   Before beginning her employment, Johnson signed SWC's work rules and attended the required training.  (*See id.*; *id.* at Ex. 2 (dkt. #15-2) 1-5.)

---

[1] Consistent with the parties' submissions on summary judgment, the court finds that the following facts are material and undisputed, unless otherwise noted.

[2] Henkes served as interim director from April 1, 2007, to August of 2007, when he assumed the position of director.

## II. The May 26th Incident

On May 16, 2010, Johnson began working as a one-to-one caregiver for a SWC resident receiving treatment at "St. Mary's Wheaton Franciscan Hospital" in Racine, Wisconsin.[3]  (Olson Decl. Ex. 11 (dkt. #22-11) 13.)  On May 26, 2010, Henkes received a phone call from a supervising nurse at St. Mary's who reported that "Johnson had caused the SWC resident's head to strike a wall three times" while he was using the toilet.  (Defs.' Reply PFOF (dkt. #31) ¶ 30.)  In response, Henkes ordered Johnson's unit director, Dave Anderson, to suspend her and conduct an internal investigation of the incident.

## III. Johnson's Investigation

Anderson's investigation included witness interviews and a review of several relevant documents.[4]  As a first step, Anderson instructed another SWC employee to interview the resident Johnson had allegedly abused.  The resident did not suffer any apparent injuries, but he had been scheduled for a CT scan because he vomited shortly after the incident with Johnson.  The CT scan showed no evidence of internal bleeding or other acute findings. The resident's limited cognitive skills impaired his ability to respond to questioning, and the interview shed no light on the incident.

Anderson next interviewed Julie Womack, a St. Mary's CNA who assisted Johnson in caring for the resident.  Womack was the only eyewitness to the incident other than

---

[3] The parties state that Johnson was assigned to work at St. Mary's on May 26, 2010.  In an interview with the DHS's Division of Quality Assurance, however, Johnson stated that she actually began this assignment on May 16, 2010.  (Olson Decl. Ex. 11 (dkt. #22-11) 13.) On May 26, 2010, Johnson switched from third shift to first shift.  (*Id.*)
[4] The documents included: the SWC resident's CT scan, which showed no head injuries; Johnson's own medical records for treatment she received after being injured in the incident; and Johnson's written statement of the events.

Johnson and the resident.  In response to the resident's repeated attempts to get off the toilet, Womack reported seeing Johnson take the resident's head with both of her hands and quickly bang it against the wall three times.  While Johnson was doing this, Womack noted that the resident was swinging his hands trying to hit her.

On June 3, 2010, Anderson interviewed Johnson herself with a union representative present.  Her account was quite different from Womack's.[5]  Johnson denied that any abuse had occurred or that she had ever told the resident to "sit down" while he was toileting.  According to Johnson, the resident was having difficulties using the bathroom and was eager to be off the toilet.  In persuading him to continue trying, Johnson placed her hand on his shoulder.  When the resident tried to bite her, she used her arm to turn his torso toward the wall, away from her.  At one point, she also used her knee to move the resident's lower body toward the wall.  After the resident finished on the toilet, Johnson cleaned him up and assisted him back to bed.  She specifically denied that the resident's head ever hit the wall.  Johnson also pointed out that she had suffered injuries as a result of the incident, including a puncture wound and bruising on her right arm.

After speaking with the supervising nurse who reported the incident, Anderson then interviewed Ron Antrium, another St. Mary's nurse, who reported that he had been in an

---

[5] Although there appears to be a genuine dispute of fact as to what actually happened on May 26th, that dispute is not material to Johnson's race discrimination claims.  *See Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) ("The question [in a wrongful termination case] is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge.  It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.") (internal citations and quotation marks omitted).

adjoining room, but did not see the incident.  Antrium did report hearing Johnson yelling "sit down" several times in a loud voice.  He also reported that he heard banging coming from the resident's room.  When Antrium went to see what was happening, everything appeared to be under control.

**IV. Johnson's Termination**

After completing his investigation, Anderson met with Henkes; Rebecca Eichner, SWC's Human Resources Director at the time; and Michelle Glenn, the deputy director of SWC.   Together, Anderson, Henkes, Eichner and Glenn went through the witness interviews and investigation results.   Ultimately, they decided there was just cause to terminate Johnson.  They relied on four critical facts in making their determination:  (1) the alleged conduct – banging a resident's head against the wall while he was toileting – was serious; (2) Womack had no reason to fabricate her account of the May 26th incident because she had never met Johnson before; (3) Antrium corroborated Womack's account by reporting that he heard banging; and (4) the hospital ordered a CT scan right after the incident, something Henkes felt doctors would not normally do without good reason.

Anderson, Henkes, Eichner and Glenn all felt Johnson had intentionally struck the resident's head against the wall and that this was not an act of self-defense.[6]  They also concluded that Johnson's actions could reasonably be expected to cause pain or harm to the

---

[6] Johnson disputes this fact by noting a semantic issue with the wording of defendants' proposed finding of fact.  Specifically, Johnson asserts the reference to "they" is unclear. (Pl.'s Resp. Defs.' PFOF (dkt. #28) ¶ 54.)   Taken out of context, the concern might be valid, but the surrounding proposed facts make clear that defendants use "they" to refer to Anderson, Henkes, Eichner and Glenn.  (*See, e.g.*, Defs.' PFOF (dkt. #12) ¶ 51.)  Given that Johnson fails to identify anything in the record that contradicts the *substance* of this fact, the court accepts it as undisputed.  *See* Fed. R. Civ. P. 56(e).

resident.  Finally, they concluded that Johnson did not follow SWC protocol or her training by forcing the resident to remain on the toilet when he wanted to get up.  At no time during the meeting did anyone discuss Johnson's race.

Henkes and Eichner then discussed the appropriate discipline for Johnson.  While Henkes was aware of Johnson's race from a previous interaction, the subject of her race never came up in this discussion.[7]  Ultimately, Henkes and Eichner decided that Johnson's conduct was so serious that discharge was the only appropriate response.[8]  In his June 10, 2010 termination letter, Henkes informed Johnson that she had violated Work Rule No. 1, "disobedience, insubordination, inattentiveness, negligence, or refusal to carry out written or verbal assignments, directions, or instructions," and Work Rule No. 2, "abusing, striking, or deliberately causing mental anguish or injury to patients, inmates, or others."  (Henkes Decl. Ex. 5 (dkt. #15-5) 1.)

**V.  The M.G. Investigation**

The sole basis for Johnson's race discrimination claim is that another employee, M.G., who is white, was accused of similar conduct but only received a suspension.  (First Am. Compl. (dkt. #9) ¶ 408.)

---

[7] Johnson concedes that Henkes and Eichner never mentioned her race in discussing the appropriate discipline.  (Pl.'s Resp. Defs.' PFOF (dkt. #28) ¶ 60.)

[8] Johnson disputes this fact by again raising a semantic argument over the wording of the proposed finding and asserting that Henkes is not competent to offer testimony as to what Eichner "felt."  (Pl.'s Resp. Defs.' PFOF (dkt. #28) ¶ 55.)  Again, because Johnson does not offer record support to dispute that this is what Henkes and Eichner ultimately *decided*, the court accepts this fact as undisputed.  *See* Fed. R. Civ. P. 56(e).

In 2007, M.G. slapped a SWC resident on the back of the head with an open hand after the resident tried to wander out of a SWC dormitory. [9]  The resident, who was verbal and capable of reporting abuse or neglect, did not seek out any SWC staff members to report the incident directly, but she eventually confirmed in an interview that M.G. struck her.  Henkes was the interim director of SWC at the time.

Unit director Sharon Harty investigated the incident.  While Harty did not interview the only eyewitness to the event, she did include the witness's hand-written statement in SWC's investigatory file.  Harty also interviewed or directed others to interview M.G. and other SWC staff members about the incident.  All interview notes went into SWC's investigatory file.  After the investigation, Henkes reviewed the file and issued M.G. a five-day suspension.  Henkes justified his disciplinary decision by concluding that M.G.'s conduct was not so egregious or dangerous to the resident's safety that it warranted termination.

## VI.  The Division of Quality Assurance Investigations

Whenever Henkes believes a SWC employee may have abused a resident, he must submit a report to DHS's Division of Quality Assurance ("DQA").  DQA then reviews SWC's investigatory process to ensure resident safety.  DQA does not offer an initial opinion as to whether a particular abuse allegation is true, but can issue a "regulatory deficiency" if it concludes that SWC's investigation is faulty.  Beyond this procedural review

---

[9] This incident involved a different SWC resident from the one Johnson was caring for on May 26th.

function, DQA also conducts a separate investigation to determine whether an employee should be subject to professional discipline.

For Certified Nursing Assistants, DQA's professional discipline involves placing the employee on the Wisconsin Caregiver Misconduct Registry. Once DQA places the employee's name on the registry, that employee's CNA certification is revoked, and he or she may no longer be employed as a CNA at SWC. DQA's investigations are independent from SWC's investigations and may take considerably longer to complete. Thus, even if SWC decides not to terminate an employee on its own, it must terminate that employee if placed on the registry after DQA's own investigation. DQA determinations do not affect SWC disciplinary decisions in any other way.

Henkes referred both Johnson's and M.G.'s alleged abuses to DQA for investigation. In Johnson's case, DQA did not assess a regulatory deficiency for problems with SWC's investigation. However, the agency found "insufficient evidence to prove that the alleged incident occurred" and took no further action against Johnson. (Olson Decl. Ex. 8 (dkt. #22-8).) In M.G.'s case, DQA *did* find evidence of caregiver misconduct and added her name to the registry. SWC then terminated M.G., who was no longer qualified to work as a CNA.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations omitted). While this court will construe all possible inferences in the non-moving party's favor, *Anderson*, 477 U.S. at 255, summary judgment is, in effect, "'the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir.1999)). It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If she fails to do so, "the moving party is entitled to judgment as a matter of law." *Id.* at 250. Here, Johnson has simply failed to come forward with sufficient evidence to support any of her claims.

## I.  Title VII Claims

Johnson's complaint alleges that Henkes and the Wisconsin Department of Health Services wrongfully terminated her on account of her race in violation of Title VII of the

Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*).   When a plaintiff alleges race discrimination, she "can survive summary judgment through the direct or indirect method of proof (or both)."  *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). Johnson argues she has produced sufficient evidence to proceed under either method.  (Pl.'s Resp. (dkt. #19) 7.)   Specifically, Johnson contends that the evidence would permit a reasonable trier of fact to conclude that a similarly situated individual (i.e., M.G.) received better treatment than she did, and that this creates an inference of race discrimination.  (*Id.* at 7-8.)  For reasons discussed below, the court concludes that Johnson's single example of an allegedly similarly situated employee does not support an inference of discriminatory intent on the part of Henkes or DHS.

Under the direct method, Johnson must offer "either direct evidence or circumstantial evidence that supports an inference of intentional discrimination."  *Alexander*, 739 F.3d at 979; *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 & n.3 (7th Cir. 2005) (direct *evidence*, along with circumstantial evidence, are ways of proving race discrimination under the direct *method*).[10]   Johnson identifies no "smoking gun" admission of discriminatory intent that would constitute direct evidence and instead relies on circumstantial evidence to proceed under this method.

To prevail under this method, a plaintiff must construct "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the

---

[10]  The Seventh Circuit has acknowledged that there is often confusion with the methodology in Title VII race discrimination cases.  *See, e.g.*, *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J. concurring) ("[T]he various tests that we insist lawyers use [in Title VII litigation] have lost their utility . . . . the time has come to collapse all these tests into one.").  The court is sympathetic to the parties' proposals to do away with these technical distinctions, (*see* Defs.' Br. (dkt. #16) 5 n.3; Pl.'s Resp. (dkt. #19) 7), but will continue to analyze the direct and indirect methods separately.

decisionmaker.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Such circumstantial evidence "may include suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011) (internal quotations omitted). "Whatever circumstantial evidence a plaintiff presents must point directly to a discriminatory reason for the employer's action." *Id.* (internal quotations omitted).

Under the indirect method, in contrast, a plaintiff follows the traditional framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Alexander*, 739 F.3d at 979. Under this framework, Johnson must first make out a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) at least one similarly situated employee, not in her protected class, was treated more favorably. *See id.* at 979; *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse employment action which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Alexander*, 739 F.3d at 979 (internal quotations omitted). Once the defendant offers a non-discriminatory reason, "the burden returns to the plaintiff[] to prove, by a preponderance of the evidence, that the proffered reason is a pretext for race discrimination." *Id.* (internal quotations omitted).

11

In this case, Johnson argues that a single piece of evidence fulfills several of the requirements of both the direct and indirect methods of proffer -- that she was similarly situated to M.G., but received harsher discipline because of her race.  (Pl.'s Resp. (dkt. #19) 8.)  In the direct method context, this is Johnson's *only* circumstantial evidence of Henkes' discriminatory intent.  In the indirect method context, Johnson offers this same evidence both to establish her *prima facie* case and to rebut as pretextual defendants' proffered, non-discriminatory reason for firing her.

For the direct method, Johnson's single example falls well short of creating a "convincing mosaic" that reveals a discriminatory intent.  *See Rhodes*, 359 F.3d at 504.  In particular, this lone example would not permit a reasonable juror to find that "similarly situated employees outside the protected class received *systematically* better treatment." *Alexander*, 739 F.3d at 979 (emphasis added).

In reviewing circumstantial evidence,

> [t]he ultimate question . . . is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of [her] protected status or activity. To answer that question, the individual "bits and pieces" presented by the plaintiff must be put into context and considered as a whole. All reasonable inferences, of course, must be drawn in favor of the non-moving party. Only then can it be seen whether the plaintiff's evidence amounts to a "convincing mosaic" sufficient to withstand a motion for summary judgment or judgment as a matter of law.

*Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013).

Here, Johnson's problem is that she offers no other "bits and pieces" of evidence beyond the example of one employee receiving better treatment.[11]   Moreover, Johnson

---

[11] Although identifying a single comparator may be sufficient under the indirect method, Johnson does not suggest that an isolated example is enough to satisfy the direct method's

admits that "[s]ince Henkes has been SWC's director, he has terminated . . . Caucasian employees accused of resident abuse [and] issued suspensions or other discipline to African American employees accused of abuse." (Pl.'s Resp. Defs.' PFOF (dkt. #28) ¶ 75.)  In short, Johnson all but concedes that Henkes did not *systematically* treat similarly situated employees better than she.  In any event, Johnson has failed to offer evidence approaching, much less creating, a "convincing mosaic" of discrimination for purposes of the direct method.

Johnson fares no better under the indirect method, which involves the *McDonnell Douglas* burden shifting analysis.  *Coleman*, 667 F.3d at 845.  While this court would normally evaluate all four elements of Johnson's *prima facie* case before moving on to defendants' justification, when "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the pretext inquiry."  *Collins*, 715 F.3d at 1000 (internal quotations omitted).  Thus, the court proceeds directly to the pretext prong of the *McDonnell Douglas* analysis. *Id.*

"Pretext means a lie, specifically a phony reason for some action." *Collins*, 715 F.3d at 1000 (internal quotations omitted).  The question is not "whether the employer's stated reason [for termination] was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Id.*  To show pretext in a case of disparate discipline based on race, "the plaintiff typically must demonstrate that the

---

requirements of systematically better treatment of employees outside her class. *See Blasdel v. Nw. Univ.*, 787 F. Supp. 2d 759, 773 (N.D. Ill. 2011) *aff'd*, 687 F.3d 813 (7th Cir. 2012) (finding that a plaintiff does not show better treatment of a class as a whole just by identifying one person in that class who received better treatment).

other employees 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 479 (7th Cir. 2010) (quoting *Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009)).

As already mentioned, Johnson's evidence of pretext is that one SWC employee, M.G. was allegedly similarly situated, outside her protected class, and engaged in similar misconduct but received lighter discipline.   From this alone, Johnson argues that a reasonable jury might find Henkes' explanation for terminating her was mere pretext.  The court disagrees, however, because no reasonable jury could conclude on the limited evidence in the record that Johnson and M.G. were similarly situated.

Determining whether two employees are "similarly situated" requires a "flexible, common-sense examination of all relevant factors."   *Coleman*, 667 F.3d at 846 (internal quotations omitted).  These factors include:  (1) whether the two employees had a common supervisor; (2) whether the two employees were subject to the same rules of conduct; and (3) whether the two employees engaged in similarly serious conduct.   *Id.* at 847.[12]   If plaintiff and another employee are "directly comparable . . . in all material respects," they are similarly situated even though "not be identical in every conceivable way."  *Id.* (internal quotations omitted).   On the other hand, if the distinctions between plaintiff and his proposed comparator are "so significant that they render the comparison effectively useless," they are not similarly situated.  *Id.*

_____

[12] While "[t]he number of relevant factors depends on the context of the case," a plaintiff must at least show these three in "the usual case."  *Coleman*, 667 F.3d at 847.  The parties emphasize these three factors (*see* Defs.' Br. (dkt. #16) 5; Pl.'s Resp. (dkt. #19) 8), and the court agrees that they are appropriate in this case to analyze whether Johnson and M.G. were similarly situated.

This fact-intensive inquiry is usually a question for a jury, but summary judgment is appropriate when no reasonable fact-finder could find that a plaintiff has met her burden on the issue. *Id.* at 846-47.  Moreover, it is reasonable to expect a higher degree of similarity where, as is true here, a plaintiff "cherry-picks" her comparator from a pool of employees. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) *aff'd*, 553 U.S. 442 (2008); *Borg v. Shorewest Realtors, Inc.*, 11-cv-00986, 2013 WL 3280304, at *4 (E.D. Wis. June 27, 2013) (citing *Humphries*, 474 F.3d at 405) ("[P]laintiff cannot establish a prima facie case of discrimination by cherry-picking comparators and ignoring those who were treated less favorably than her.").

Here, the parties agree that Henkes receives several allegations of abuse by SWC staff each month, that Henkes makes several disciplinary decisions each day and that he terminates between 12 and 24 SWC employees each year.  Thus, in the five years between M.G.'s discipline and Johnson's termination, Henkes roughly terminated between 60 and 120 employees while disciplining countless more.  Even if some of these terminations were for conduct other than resident abuse, the fact that Johnson has identified only *one* comparator from this pool strongly suggests cherry-picking.[13]

Regardless of the level of scrutiny the court applies, the ultimate question remains whether Johnson offers a comparator whose differences are too significant to allow for meaningful comparison.  Since it is undisputed that M.G. and Johnson had the same supervisor and worked under the same code of conduct, Johnson's entitlement to proceed

---

[13] The court is cognizant of the Seventh Circuit's warning to district courts not to require too much similarity between comparators.  *See Coleman,* 667 F.3d at 851-52.  For the reasons discussed in the remainder of this opinion, however, defendants are entitled to summary judgment even under a lenient standard of comparison.

before a jury on her claim that she and M.G. are similarly situated hinges on whether they engaged in similarly serious conduct.  In response to defendants' Proposed Findings of Fact, Johnson essentially admits that *Henkes* felt M.G.'s slap to the back of a resident's head was deserving of a 5-day suspension, rather than termination.  (Pl.'s Resp. Defs.' PFOF (dkt. #28) ¶ 71 (conceding Henkes' feelings though disputing others).)  Johnson also concedes that *Henkes* felt that her repeated pounding of a resident's head against a wall was so serious and dangerous that it required termination, rather than suspension.  (*Id*. at ¶ 55.)  Whether Henkes' conclusions in either respect were wrong or even unfair, the defendants are not liable unless the trier of fact could reasonably find that Henkes did not honestly believe his reason for terminating Johnson.[14]  *Coleman*, 667 F.3d at 853 ("If the [defendant] terminated [the plaintiff] because it 'honestly believed' she posed a threat to other employees—even if this reason was 'foolish, trivial, or baseless'—[the plaintiff] loses.").  Johnson offers no evidence upon which a reasonable trier of fact could question whether Henkes' stated reason for acting -- that he believed Johnson's conduct more dangerous and more deserving of termination -- was not held in good faith, much less that Henkes was actually motivated by race.  Thus, Johnson faces an uphill battle in proving that Henkes' reason is mere pretext.

Even ignoring Johnson's admissions and drawing all reasonable inferences in her favor, there is no factual basis by which a reasonable jury could question Henkes' expressed belief that M.G.'s and Johnson's actions were different in the degree of seriousness.  The

---

[14] Of course, although defendant DHS might theoretically be liable even though Henkes is not, since there is no dispute that Henkes was the principal decision-maker, there is no practical difference between the defendants' source of liability; both rise or fall on the legality of Henkes' decision-making.

internal SWC investigation found that M.G. "struck [a resident] on the back of the head with an open hand.  The sound was heard over the volume of the television." (Olson Decl. Ex. 2 (dkt. #22-2) 5.)  Included in the investigation files was a handwritten note from the lone eyewitness of the incident, which explained that the resident started to wander out of her dormitory, so M.G. followed her, guided her back to her seat, went to close the door to the dormitory, and then smacked the resident on the back of the head with an open hand. (*Id.* at 9.)  In contrast, the eyewitnesses to Johnson's incident described more dangerous conduct.  According to Womack, Johnson grabbed the resident's head with both hands and quickly banged it against the wall three times hard.  (*Id.* Ex. 5 (dkt. #22-5) 1-2.)  This all occurred as the resident was sitting on the toilet.  Although Antrium did not see the incident, he also reported hearing pounding and loud noises coming from the resident's room.  (*Id.* Ex. 6 (dkt. #22-6) 6.)

These obvious, undisputed differences in eyewitnesses accounts of the severity of conduct in the two incidents are enough to make M.G. an inappropriate comparator, even without the closer scrutiny justified by Johnson's cherry-picking of a single would-be comparator from a much larger population.  Although both employees violated the same SWC work rule, no reasonable jury could conclude that Henkes lacked an honest belief that M.G.'s violation was less serious than Johnson's.  *See Weber v. Univs. Research Ass'n*, 621 F.3d 589, 594-95 (7th Cir. 2010) (plaintiff cannot use as comparators fellow employees who violated policies to a lesser degree and without "the same reckless abandon"); *Poe v. Univ. of Chi. Police Dep't*, No. 10-cv-6811, 2013 WL 2112107 (N.D. Ill. May 15, 2013) (employees who disparaged and abased their supervisors in private conversations with subordinates were not similarly situated to a plaintiff who made similar remarks publicly,

17

during a training class for subordinates). The facts before Henkes were that Johnson took a vulnerable, nonverbal resident's head in her hands and banged it against the wall three times, hard enough that someone in another room heard the banging. Furthermore, the incident described was credible enough that doctors ordered a CT scan after the incident. On this record, there is no reason to doubt that, at least for Henkes, Johnson's alleged behavior was more "egregious and dangerous" than a single slap to the back of the head, given to a resident who was verbal and far less vulnerable. (Henkes Decl. (dkt. #15) ¶ 42.) Indeed, no reasonable jury could conclude otherwise.

To escape this conclusion, Johnson nevertheless argues that the follow up DQA investigations of both incidents are "sufficient to permit the Court to find that a reasonable jury might . . . find that [M.G.'s] violation was not materially less severe than that of which Ms. Johnson was accused." (Pl.'s Resp. (dkt. #19) 17.) Alternatively, Johnson argues that the two investigations "permit the Court to find that a reasonable jury might . . . find that there was at least as much doubt [as to whether abuse occurred] in Ms. Johnson's case" as there was in M.G.'s case. (*Id.*) Both of these arguments fail on this record, not least because they misunderstand the nature of the DQA investigations and the role they play in the Title VII context.

First, the outcome of the DQA investigation of the Johnson incident does not create a dispute as to what Henkes believed when he fired her. The DQA investigation began on September 15, 2010, and concluded on October 21, 2010, several months *after* Henkes had made his decision to terminate Johnson. (Olson Decl. Ex. 11 (dkt. #22-11) 2.) Johnson does not explain how an investigation that started *after* her termination has any bearing on Henkes' belief in the seriousness of Johnson's behavior *at the time of* her termination.

18

The investigations also do not bear on the relative severity of Johnson's and M.G.'s conduct. In Johnson's case, DQA concluded that "there [was] insufficient evidence to prove that the alleged incident occurred." (Olson Decl. Ex.11 (dkt. #22-11) 1.) The agency did *not* conclude that the abuse did not occur, only that its own investigation did not produce enough evidence to prove the allegation. As Johnson points out, the DQA investigation into the M.G. incident ultimately found there *was* enough evidence to substantiate the allegation of caregiver misconduct in M.G.'s case. She incorrectly argues, however, that the two investigations are necessarily linked. The DQA neither issued an opinion comparing the relative severity of either violation, nor indicated that DQA found the alleged misconduct to be equally severe. Moreover, DQA's own investigation letters note that its "determination ... does not affect, negate, or resolve employment issues relating to possible work rule violations." (*Id.*) Given the expressly limited scope of DQA's findings, broader investigative scope and more sweeping consequences of an adverse ruling, the court is unwilling to accord it the broad importance Johnson proposes in a Title VII case.

Certainly, the fact that subsequent investigations by DHS's DQA cast doubt as to whether the Johnson incident occurred, at least as originally reported to and accepted by Henkes. As an initial matter, there is a question whether the DQA investigations and findings are admissible at all in a Title VII case. (*See* Defs.' Reply (dkt. #33) 9.) Analogizing the DQA investigations to Equal Employment Opportunity Commission determinations, defendants argue both the investigations and findings are inadmissible. (*Id.*) As Johnson points out, however, "administrative findings regarding claims of discrimination may be admitted under [Federal Rule of Evidence] 803(8)(C) ... unless the sources of information or other circumstances indicate lack of trustworthiness." *Young v.*

*James Green Mgmt., Inc.*, 327 F.3d 616, 624 (7th Cir. 2003).  Indeed, since DQA is actually a division of defendant DHS, its findings are arguably admissible as statements of a party opponent pursuant to Fed. R. Civ. P. 801(2).

Nevertheless, the Seventh Circuit acknowledges in *Young* that "the district court retains significant discretion as to whether such material ought to be admitted."  *Id.* at 624 (quoting *Holloway v. Milwaukee Cty.*, 180 F.3d 820, 827 n.9 (7th Cir. 1999).  In *Young*, the Seventh Circuit upheld a district court's discretion in excluding an EEOC determination of discrimination because of its lack of reliability and trustworthiness.  As recognized in *Young*, there is also the larger question of "whether the prejudicial effect of admitting such unreliable information may outweigh its probative value and thereby render it inadmissible under Fed. R. Evid. 403."  *Id.* at 624 (quoting *Tullos v. New N. Montessori Sch., Inc.*, 776 F.2d 150, 153 (7th Cir. 1985).

Here, those same concerns exist.  As previously noted, the DQA investigation is independent from SWC's investigation.  While the SWC investigation is directed at work rule violations, DQA focuses on determining whether a situation justifies banning a CNA not just from a current job, but from *all* CNA positions by placing her on the misconduct registry.  This helps explain why DQA investigations are admittedly more thorough, the CNA's due process rights greater and, presumably, the standard of proof higher.  Nevertheless, if admitted into evidence, this court has no doubt that DQA's conclusion that an eyewitness account of Johnson's actions was not sufficient to justify disqualifying Johnson for *all* jobs would predominate over and unfairly prejudice the actual issue the jury would be asked to decide in this case:  whether *Henkes* had reason to doubt the original, firsthand reports when deciding to terminate Johnson from her existing job.  Moreover, as

20

previously discussed, Johnson has already admitted Henkes actually held this belief, whether or not it was ultimately confirmed by DQA's subsequent investigation.[15]

Absent credible evidence that Henkes had contemporaneous doubt as to whether one incident was more or less likely to have occurred, this court's inquiry into whether Johnson and M.G. are similarly situated turns on the question of whether their alleged misconduct was *similarly serious*.  *See Coleman*, 667 F.3d at 847.  Not only do the DQA investigations not address this question, but Johnson offers no other evidence of similarly situated employees receiving more favorable treatment.  Accordingly, Johnson's Title VII claim fails for lack of evidence allowing a reasonable trier of fact to find that the defendants' legitimate, non-discriminatory reason for terminating her was mere pretext.

## II. Equal Protection Claim

"[T]he same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."  *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003).  To succeed on her Equal Protection claim against Henkes, Johnson must offer direct proof (through direct evidence or circumstantial evidence) or go through *McDonnell Douglass'*

---

[15] Of course, excluding the DQA's findings would not preclude Johnson from offering evidence of what Henkes actually considered in arriving at his disciplinary rulings with respect to M.G. and Johnson, including testimony from Johnson, M.G. and their principal accusers, to determine whether the strength of the proof of Johnson's misconduct was substantially weaker than that against M.G.  This, however, is something Johnson decided not to do in response to defendants' motion for summary judgment, relying instead upon inadmissible DQA findings.  Having made this choice, Johnson must now live with its consequences.  *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events" (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)) (internal quotation marks omitted).).

burden shifting framework. *Id.* As the court has already concluded, Johnson fails to identify a similarly situated employee and, therefore, that defendants' legitimate reasons for termination were pretextual. Accordingly, Johnson's Equal Protection claim fails as well.


ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #11) is GRANTED; and

2) The clerk of the court is directed to enter judgment in favor of defendants and close this case.

Entered this 18th day of April, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

22